UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | No. 23-CR-421 (JMC) |
| | : | |
| **SIAKA TONIA MASSAQUOI** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' MOTIONS *IN LIMINE*

The United States respectfully submits this omnibus brief in support of several motions *in limine* in advance of trial scheduled for January 21, 2025. Although neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). "Motions in limine are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011).

The government offers the authorities and analysis below to promote efficiency and reduce the need to argue objections during trial. For each motion herein, the government asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments should the issues arise during trial.

## BACKGROUND

The Court is familiar with the riot at the U.S. Capitol on January 6, 2021, which disrupted Congress's certification of the Electoral College vote and forced it to evacuate the House and Senate Chambers. *See* ECF No. 1-1 ("Statement of Facts").

The Defendant, Siaka Massaquoi ("Massaquoi") traveled from California to Washington, D.C. on January 5, 2021. Massaquoi believed that the 2020 presidential election was fraudulent and knew about Congress and the Vice President's role in the Electoral College certification on January 6, 2021. On the morning of January 6, Massaquoi attended the "Stop the Steal" rally, went back to his hotel, watched the news about the riot at the Capitol, and then decided to join rioters on the west front of the Capitol. While walking in downtown Washington, D.C., Massaquoi filmed himself saying, "We're headed now to the state Capitol to support our president . . . Pence you ain't gotta do nothing crazy, just gotta do what's written down in the law, you know what I mean." Later in the same video, Massaquoi reiterated, "He ain't gotta do nothing more than his job. That's it. If he doesn't do his job, then we understand exactly what fight we're in now."

Upon entering restricted grounds around the Capitol, Massaquoi filmed himself climbing over a toppled bike-rack barricade to access the lawn on the west front of the Capitol. As he moved closer to the Capitol, Massaquoi remarked, "this is completely legal . . . people come out and they get pissed off . . . not only the media, but the politicians for stealing, stealing, stealing from the people." While on the west front, Massaquoi filmed himself speaking to other rioters, including about members of Congress hiding in the basement of the Capitol and the Mayor's emergency curfew scheduled for 6:00pm that evening. Massaquoi also participated in several chants with the mob, including "Whose Streets? Our Streets!" and "Whose House? Our House!"

Shortly after 2:53 p.m., Massaquoi filmed another video of himself ascending the northwest scaffolding toward the Capitol building. Massaquoi expressed his intent to enter the Capitol and discussed the disruption of the certification, saying, among other things, "we're gonna go in" and "Let's go see. Let's get it . . . This is insane . . . Disrupted the meetings so they can't do the vote . . . Pennsylvania and Wisconsin are changing. They're changing their vote tomorrow."

2

Around 3:30 p.m., open-source video captured Massaquoi on the Upper West Terrace near a line of police officers in riot gear. There, Massaquoi witnessed rioters clash with police, who responded by deploying pepper spray or some other form of chemical irritant against the mob. Despite witnessing this violence, Massaquoi continued to approach the Capitol building and arrived at the area outside the Senate Wing Doors. Massaquoi took another video in which a rioter said, "We pay these fucking taxes and they're hiding inside like cowards. Come outside and face the people" Massaquoi responded, "That's right. That's right" As he approached the building, Massaquoi filmed the shattered windows near the Senate Wing Doors and commented, "This is what happens when you push the people so much."

At approximately 3:38 p.m., Massaquoi entered the Capitol building through the Senate Wing Doors despite the signs of violent entry. By that time, an alarm was blaring and a cordon of U.S. Capitol Police officers in riot gear were guarding the Senate Wing Doors and preventing rioters from proceeding further into the Capitol. Once inside, Massaquoi mockingly asked, "Can I get a tour of the Capitol? Of the Senate?" At approximately 3:40 p.m., Massaquoi exited the building, but continued to film the damage to the building and interact with other rioters. He remained on restricted grounds for at least another twenty minutes. In another video, Massaquoi filmed himself next to a different rioter who said, "It doesn't matter if you're a Senator, it doesn't matter if you're a congressman, it doesn't matter who you are . . . It's our country . . . It's our Capitol building . . .  You can't stop us . . . You're only there because we voted for you, we can kick you out whenever we feel like it." During this interaction, Massaquoi repeatedly affirmed, "That's right."  After departing Capitol grounds, Massaquoi again filmed himself walking around Washington, D.C. declaring, "we have the right to walk into the Capitol."

For his conduct, Massaquoi was charged by Information with violating 18 U.S.C. § 1752(a)(1) (Count One), 18 U.S.C. § 1752(a)(2) (Count Two), 40 U.S.C. § 5104(e)(2)(D) (Count Three), and 40 U.S.C. § 5104(e)(2)(G) (Count Four) on December 5, 2023. *See* ECF No. 6. This Court scheduled the case for trial on January 21, 2025.

## ARGUMENT

### I. MOTION *IN LIMINE* TO PRECLUDE QUESTIONING ON SENSITIVE NATIONAL SECURITY INFORMATION.

The government seeks an order limiting Massaquoi from probing, during cross-examination, (1) the exact locations of U.S. Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, and (2) U.S. Secret Service ("Secret Service") protocols. The government does not intend to elicit testimony on any of these topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible. *See* Fed. R. Evid. 611(b). To the extent that Massaquoi argues that these topics are relevant and within the scope of the government's examination, the government requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States*, 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See, e.g., United States v. Balistreri*, 779 F.2d 1191,

4

1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief. *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief).

Preventing Massaquoi from exploring (1) the exact locations of U.S. Capitol Police surveillance cameras and (2) Secret Service protocols will not infringe on his Confrontation Clause rights. These topics implicate national security concerns, have little to no relevance to any fact of consequence, and any probative value can be addressed without compromising the protective functions of the U.S. Capitol Police and the Secret Service.

### A. U.S. Capitol Police CCTV Surveillance Cameras

The government seeks an order limiting Massaquoi from probing, during cross-examination, the exact locations of U.S. Capitol Police surveillance cameras or from using maps which show each camera's physical location as an exhibit at trial. None of this information serves to illuminate any fact of consequence that is before the jury, and that lack of relevance must be

balanced against the national security implications at stake.

The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting members of Congress. The camera maps showing the physical location of cameras have also been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the U.S. Capitol Police Board before they may be released. Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded considering the ongoing security needs of Congress. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. The video footage itself reveals the *general* location and angle of the camera's positioning. Additional details as to the precise location of the cameras are not relevant to the factfinder.

Even assuming the evidence that the government seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security. The Supreme Court has recognized that trial courts' balancing should account for concerns extrinsic to the litigation, such as "witness' safety." *Olden v. Kentucky*, 488 U.S. 227, 232 (1988). Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight. *See, e.g.*, *United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005). If a map that revealed the location of all cameras were introduced in this trial, or in any trial, it would become available to the public and foreign adversaries. Anyone could learn about the U.S. Capitol Police's camera coverage as of January 6, 2021, and—perhaps more importantly—could learn about the parts of the Capitol where cameras are not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the

6

truth, or the veracity or bias of witnesses. The Court should therefore grant the government's motion in limine to exclude unnecessary cross-examination about the U.S. Capitol Police's surveillance camera system.

### B. Secret Service Protocols

The government also seeks an order limiting Massaquoi from probing, during cross-examination, Secret Service protocols during an emergency requiring the evacuation of protectees. To meet its burden of proof at trial, the government may call a witness from the Secret Service to testify that, at the time of the riot on January 6, 2021, Secret Service agents were on duty protecting Vice President Mike Pence and his family members, who were present at the Capitol for the Electoral College certification. The witness will further testify about the Capitol riot's effect on the Secret Service's protection of Vice President Pence and his family members.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking officials. The government seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the official functions performed by the Secret Service, namely, protecting the Vice President and his family. The government also requests that the order preclude cross-examination on topics not directly related to whether the Secret Service was performing those functions at the Capitol on January 6, 2021. Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees. These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the government's legitimate interest in national security. *See* Fed. R. Evid. 403;

*Mohammed*, 410 F. Supp. 2d at 918 (finding that information having broader national security concerns can be excluded under Rule 403 because its tendency to confuse the issues, mislead the jury, create side issues or a mini-trial and can result in undue prejudice that substantially outweighs any probative value).[1]  The Court should therefore grant the government's motion in limine to exclude unnecessary cross-examination about Secret Service protocols.

## II.   MOTION *IN LIMINE* TO PRECLUDE IMPROPER DEFENSE ARGUMENTS

### A. First Amendment

The government moves this Court to admit statements that evince Massaquoi's knowledge, motive, or intent—which go to prove an element of the offenses with which he is charged.  The government also moves *in limine* to preclude Massaquoi from eliciting evidence or arguing to the factfinder that his statements and actions were protected by the First Amendment. Massaquoi previously moved to dismiss all charges based, in part, on the arguments that he was permitted to be at the Capitol and that the charged crimes target his subjective viewpoints. *See* ECF No. 26.

---

[1] If Massaquoi believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of U.S. Capitol Police cameras or Secret Service procedures, the government requests that the Court conduct a hearing *in camera* to resolve the issue. Courts have found that *in camera* proceedings are appropriate in circumstances where security concerns like these are present. *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that *in camera* . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that *in camera* proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security"); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially outweighed by the prejudice that disclosure would inflict on the government's security interests. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

### 1. The Admission of Defendant's Statements Does Not Violate the First Amendment.

The government intends to introduce certain statements made by Massaquoi that will aid the factfinder's determination whether the defendant intended to disrupt government business and the orderly conduct of Congress. For example, prior to arriving at the Capitol on January 6, Massaquoi filmed himself walking around Washington, D.C. making statements about the election and the certification process, including "Pence you ain't gotta do nothing crazy, just gotta do what's written down in the law." Gov. Ex. 703. And after departing the Capitol on January 6, Massaquoi filmed himself on the streets of Washington, D.C. saying, "Trump supporters, American citizens have the right to walk into the Capitol because it's our Capitol. It's not the politicians' Capitol. It's ours . . . The police, the gestapo came and stopped people from going into the building that is theirs . . . We have the right to go in there." Gov. Ex. 710. These statements, and others like them,[2] are highly probative of the defendant's motive to

It is well settled that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Because these statements shed light on Massaquoi's motive, knowledge, and intent to disrupt, the statements should be admitted consistent with *Mitchell*—regardless of whether those statements may otherwise constitute speech protected by the First Amendment. Courts in other January 6 cases have consistently allowed evidence of defendants' statements for purposes of showing intent and motive. *See United States v. Robertson*, 588 F. Supp. 3d 114, 124 (D.D.C. 2022) ("Nor does the Court find any First Amendment concerns in the government's use

---

[2] To be clear, the government intends to introduce additional statements by Massaquoi beyond those referenced here in the motion in limine.

9

of Robertson's statements to show intent. . . . If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification. His words remain relevant to his intent and motive for taking those alleged actions"); *see also United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021). The Court should do the same here.

### 2. This Court Should Preclude Defendant from Raising a First Amendment Defense.

The government also moves *in limine* to preclude Massaquoi from arguing that his conduct was protected by the First Amendment. None of the offenses under which Massaquoi is charged punish speech. *See, e.g.*, *United States v. Baez*, No. 21-cr-507 (PLF), 2023 WL 3846169 (D.D.C. June 2, 2023) (rejecting January 6 defendant's facial and as-applied challenges under the First Amendment to the same misdemeanors charged here). The charged crimes punish trespassing and disorderly conduct on restricted Capitol grounds. "No matter [the rioter's] political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment." *United States v. Nordean*, 579 F. Supp. 3d 28, 53 (D.D.C. 2021). The Capitol building itself is a nonpublic forum, see *United States v. Nassif*, 97 F.4th 968, 977-78 (D.C. Cir. 2024), and the surrounding grounds were subject to a content-neutral restriction on January 6, 2021, which advanced a substantial government interest in public safety and order—an interest that is "amplified near the Capitol . . . where prominent public officials are present and conducting official government business." *Mahoney v. U.S. Capitol Police Bd.*, 566 F. Supp. 3d 1, 9 (D.D.C. 2022).

Ultimately, the First Amendment provides no defense to the crimes charged even if evidence of the defendant's knowledge and intent is intertwined with political messaging. *See*

10

*United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it"); *United States v. Hassan*, 742 F.3d 104, 127-28 (4th Cir. 2014) (citing *Amawi*). Any First Amendment argument advanced by Massaquoi fails as a matter of law and is irrelevant under Fed. R. Evid. 401 because it does not bear on any of the elements of the charged offenses.

### B. Public Authority and Entrapment by Estoppel

Notwithstanding the defendant's failure to provide adequate notice under Fed. R. Crim. P. 12.3,[3] the government moves *in limine* to preclude Massaquoi from arguing that he reasonably relied on President Trump's statements prior to the riot on January 6, 2021.

A public authority defense is available only where a defendant "has knowingly acted in violation of federal criminal law but has done so in reasonable reliance on the authorization of a governmental official." *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015). "The public authority defense is narrowly defined." *United States v. Navarro*, No. 22-cr-200 (APM), 2023 WL 371968, at *15 (D.D.C. Jan. 19, 2023). "[A] federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, and the defendant must have reasonably relied on that authorization when engaging in that conduct." *Id.* (quoting *Alvarado*, 808 F.3d at 484). Moreover, "the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question." *Navarro*, 2023 WL 371968, at *15 (quoting *Alvarado*, 808

---

[3] Although Massaquoi did not notice a public authority defense, numerous January 6 defendants have made public authority arguments at trial and the government moves to exclude such arguments out of an abundance of caution.

F.3d at 484). Indeed, "[t]he validity of this defense depends upon whether the government agent in fact had authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the 'public authority.'" *United States v. Burrows*, 36 F.3d 875, 881-82 (9th Cir. 1994) (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)).

First, the President lacks the lawful authority to sanction the riot at the Capitol on January 6, or any of the criminal conduct perpetrated by the defendant. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 32–33 (D.D.C. 2021).

Second, Massaquoi cannot point to any government official who advised him that his conduct was legal. As courts have consistently held, the former President's speech at the Ellipse on the morning of January 6 "neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *United States v. Sheppard*, No. 21-203 (JDB), 2022 WL 17978837, at *9 (D.D.C. Dec. 28, 2022); *see also United States v. Carpenter*, No. 21-cr-305 (JEB), 2023 WL 1860978, at *3 (D.D.C. Feb. 9, 2023); *United States v. Grider*, No. 21-cr-22 (CKK), 2022 WL 3030974, at *3 (D.D.C. Aug. 1, 2022).

Third, even assuming (counterfactually) that the former President's statements had specifically addressed the legality of his conduct, Massaquoi could not show that his reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (quoting *United States v. Batterjee*, 361 F.3d 1210, 1216-17 (9th Cir. 2004); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard). Along with a mob of other rioters,

12

Massaquoi took several unlawful steps, including knowingly trespassing on restricted grounds, climbing over a toppled barricade, and entering the Capitol despite the broken glass, blaring alarm, and heightened police presence. At a minimum, when Massaquoi entered the Senate Wing Doors guarded by U.S. Capitol Police officers in riot gear and heard the blaring alarm, any reasonable person in that circumstance would "[know] he was breaking the law" regardless of the President's purported authority. *Corso*, 20 F.3d at 529. Massaquoi should therefore be prohibited from making arguments or attempting to introduce evidence that President Trump or any other government official authorized his conduct at the Capitol.[4]

### C.  Selective Prosecution, Charging Decisions, and Other Riots

Finally, the government moves *in limine* to exclude evidence and arguments regarding selective prosecution, charging decisions, and comparisons to other riots and protests. Massaquoi previously moved to dismiss all charges or, in the alternative, to compel discovery on his selective prosecution claim based on the government's purportedly "aggressive prosecution" of individuals who rioted at the Capitol on January 6, 2021. *See* ECF No. 27 at 3. In doing so, the defendant argued that "considerably less serious charges" have been brought against (1) individuals protesting the United States' support for Israel and (2) individuals who interrupted the

---

[4] The same reasoning applies to any argument advanced by Massaquoi based on acts or omissions of the U.S. Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022), ECF No. 87. Even if Massaquoi could establish that a member of law enforcement told him that it was lawful to enter the Capitol building or allowed him to do so, the defendant's reliance would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32. An officer also cannot shield an individual from liability by failing to enforce the law or ratifying unlawful conduct by failing to prevent it. As then-Chief Judge Howell explained in the context of another January 6 case, "[s]ettled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, ECF No. 87 at 3.

confirmation hearing of Justice Kavanaugh. *Id.* The Court has not ruled on that motion. The government therefore seeks an order—out of an abundance of caution—limiting arguments and evidence at trial related to selective prosecution and comparison of January 6 to other riots and protests.

The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Wayte v. United States*, 470 U.S. 596, 607 (1985)). "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Armstrong*, 517 U.S. at 464 (citing U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547. Generally, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 124-25 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

A "presumption of regularity supports … prosecutorial decisions" such that "in the absence of clear and convincing evidence to the contrary, courts presume that [the Attorney General and United States Attorneys] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (internal quotation marks and citations omitted). This presumption exists because "the decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis courts are competent to undertake." *Id.*; *see also*

14

*United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016). The presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465.

As explained more fully in the government's response (ECF No. 31), Massaquoi's view is that he is similarly situated to protestors of the Gaza War and to individuals who protested Justice Kavanaugh's confirmation hearings, all of whom he claims were treated more leniently. *See* ECF No. 28 at 8. Courts in this district have uniformly rejected similar claims, understanding that January 6 was a unique attack on the peaceful transfer of power that threated the entire membership of Congress and the Vice President, resulted in hundreds of assaults on law enforcement officers, and cost millions of dollars in damage.[5] This Court should do the same here.

Massaquoi's comparisons fail for at least two other reasons. First, none of the cited incidents involved anywhere near the scale of violence or threats to Congress and to the peaceful transfer of power presented by the mob that Massaquoi joined—most dramatically illustrated when rioters shattered the windows adjacent to the Senate Wing Doors, and Massaquoi, in the aftermath, filmed the damage, stating in the video, "this is what happens when you push the people so much." Unlike those who participated in protests involving Israel or Justice Kavanaugh, January 6 rioters "endangered hundreds of federal officials in the Capitol complex. Members of Congress cowered

---

[5] *See United States v. Brown*, 22-cr-170 (CKK), ECF No. 105 (D.D.C. June 10, 2024); *United States v. Brett*, No. 22-cr-11 (RJL), June 17, 2024 Minute Order; *United States v. DaSilva*, 21-cr-564 (CJN), July, 12, 2 023 Order; *United States v. Miller*, 21-cr-119 (CJN), ECF No. 67 (D.D.C. Dec. 21, 2021); *United States v. Bennet*, 21-cr-312 (JEB), 2023 WL 6847013 (D.D.C. Oct. 17, 2023); *United States v. McHugh*, 21-cr-453 (JDB), 2023 WL 2384444, at *13 (D.D.C. Mar. 6, 2023); *United States v. Padilla*, 21-cr-214 (JDB), 2023 WL 1964214, at *4-6 (D.D.C. Feb. 13, 2023); *United States v. Judd*, 579 F. Supp. 3d 1, 5-9 (D.D.C. 2021); *United States v. Costianes*, 21-cr-180 (RJL), Apr. 27, 2023 Minute Order; *United States v. Groseclose*, 21-cr-311 (CRC), ECF No. 67 (D.D.C. Oct 27, 2023); *United States v. Brock*, 21-cr-140 (JDB), 2022 WL 3910549, at *11-12 (D.D.C. Aug. 31, 2022); *United States v. Rhodes*, 22-cr-15 (APM), 2022 WL 3042200, at *4-5 (D.D.C. Aug. 2, 2022); *United States v. Griffin*, 549 F. Supp. 3d 49, 58 (D.D.C. 2021).

under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *Judd*, 579 F. Supp. 3d at 8. For example, in *Brock*, Judge Bates found that the January 6 riot posed a demonstrably greater to hundreds of federal officials, including Congress and the Vice President, compared with the threat posed by the Justice Kavanaugh protests, which was "certainly a legitimate prosecutorial consideration." *Brock*, 628 F. Supp. 3d at 89, 102 (quoting *Judd*, 579 F. Supp. 3d at 8). Like Brock, Massaquoi "does not describe any similarly situated defendants given the difference in violence, threat to citizen safety, and scope." *Id.* at 103.

Second, the cited incidents did not involve breaches of a "restricted area" as required for violations of sections 1752(a)(1) and 1752(a)(2). *See United States v. Young*, No. 23-cr-241 (GMH), ECF No. 59 at 11-12 (D.D.C. June 17, 2024) (rejecting comparison to pro-Palestinian protestors for this reason). The pro-Palestinian protestors who entered the Cannon Office Building entered legally and were only arrested once they began engaging in unlawful demonstration activity. *See* ECF No. 31 at 10. By contrast, Massaquoi joined the mob on the west front of the Capitol where he filmed himself climbing over a toppled bike-rack barricade to get closer to the building. When he arrived on the Upper West Terrace around 3:30 p.m., Massaquoi observed police officers deploy pepper spray or some other form of chemical irritant to control the violent mob as they clashed with officers. Several minutes later, Massaquoi filmed shattered windows adjacent to the Senate Wing doors of the Capitol, observed police guarding the doors, heard the blaring alarm, and still proceeded to enter the Capitol despite the signs of violent entry.

Because Massaquoi fails to show that any comparators are similarly situated, Massaquoi cannot meet the heightened standard under *United States v. Armstrong*, 517 U.S. 456 (1996), to make out a selective prosecution claim. It follows that the Court should exclude any arguments or evidence at trial about the comparators as irrelevant and inadmissible.

## **CONCLUSION**

For these reasons, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Jake E. Struebing*
JAKE E. STRUEBING
Assistant U.S. Attorney
D.C. Bar No. 1673297
U.S. Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6931
Email: Jake.Struebing@usdoj.gov

*/s/ Nialah S. Ferrer*
NIALAH S. FERRER
Assistant U.S. Attorney
New York Bar No. 5748462
U.S. Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 557-1490
Email: nialah.ferrer@usdoj.gov